UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**CHRISTOPHER KLING**,                    Case No. 3:15-cv-01643-KI

             Plaintiff,                OPINION AND ORDER

    v.

**CAROLYN COLVIN, Acting
Commissioner of Social Security**,

             Defendant.


      Merrill Schneider
      Schneider Kerr Law Offices
      P.O. Box 14490
      Portland, OR 97293

            Attorney for Plaintiff

      Billy J. Williams
      United States Attorney
      District of Oregon

Page 1 - OPINION AND ORDER

Janice E. Hebert
Assistant United States Attorney
1000 SW Third Ave., Ste. 600
Portland, OR 97204-2902

Thomas M. Elsberry
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104-7075

       Attorneys for Defendant

KING, Judge:

       Plaintiff Christopher Kling brings this action pursuant to section 205(g) of the Social

Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner denying plaintiff's application for disability insurance benefits ("DIB") and

supplemental security income benefits ("SSI"). I reverse the decision of the Commissioner and

remand for further proceedings.

## BACKGROUND

       Kling received SSI based on disability as a child, and DIB as a disabled adult child, but

his entitlement to these benefits were reconsidered and terminated when Kling turned 18 years

old. After a timely request for a hearing, Kling, represented by counsel, appeared and testified

before an Administrative Law Judge ("ALJ") on September 18, 2013.

       On November 26, 2013, the ALJ issued a decision finding Kling not disabled within the

meaning of the Act and therefore not entitled to benefits. This decision became the final decision

of the Commissioner when the Appeals Council declined to review the decision of the ALJ on June 26, 2015.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R.

§§ 404.1520(b) and 416.920(b).  If the claimant is engaged in such activity, disability benefits are denied.  Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  *Parra*, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance. *Id.* (internal quotation omitted). The court must uphold the ALJ's findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations. *Id.*

## THE ALJ'S DECISION

The ALJ concluded Kling had the following severe impairments: borderline intellectual functioning, status post left ankle fracture, a conduct disorder, attention deficit hyperactivity disorder ("ADHD"), and cannabis abuse versus dependence. The ALJ found these impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ determined that since June 1, 2011, Kling had the residual functional capacity ("RFC") to perform less than the full range of medium work. Specifically, he could lift and/or carry up to 25 pounds frequently, and up to 50 pounds occasionally; he could sit, stand and walk without limitation; he could remember, understand, and carry out simple tasks with an SVP of one or two; and he would learn best by demonstration or verbal instruction instead of written instruction. He should perform work requiring only simple decisions with few, if any, workplace changes. If changes occurred, Kling should learn them through demonstration. He should have

no interaction with the general public.  He could work in proximity to coworkers, but not as a team and only have occasional interactions.

Based on this RFC, the ALJ concluded Kling could perform other work in the national economy, such as janitorial work or as an assembler.

## FACTS

Kling challenges only the ALJ's listing determination.  As a result, I summarize the facts relevant to that argument.

Since the age of three or four years old, Kling was an active kid.  When Kling attended school, he started taking medication for his ADHD.  In 2001, his mother and others referred Kling for a psychoeducational evaluation after seeing him struggle academically, display aggression, steal lighters and cigarettes, and start fires.  At that time, he tested as having a Verbal IQ of 87, Performance IQ of 77, and a Full Scale IQ of 80, putting him in the low average range. The school enrolled him in special education classes.

A year later, Kling was again referred for a psychological evaluation while hospitalized at Providence Medical Center after displaying threatening behavior, fire-setting, stealing, and lying. Kling obtained a Full Scale IQ of 84, with a Verbal IQ of 92 and a Performance IQ of 78.  Kling was about to attend the fourth grade, but he performed reading and writing at the first grade level. Gregg Reiter, Ph.D., thought Kling's ADHD diagnosis was only one of several neurodevelopmental problems.  The doctor recommended a relatively structured environment.

Kling attended outpatient therapy at Morrison Center, and the family received individual therapy and in-home therapy.  Despite the intensive treatment, Kling's behavior did not improve. He was diagnosed with ADHD (Severe) and Oppositional Defiant Disorder with Early

PAGE 6 - OPINION AND ORDER

Childhood Conduct Features.  In August 2002, Kling began inpatient treatment at the Christie

School.  At that time, he had tried Ritalin, Adderall, Wellbutrin, and Risperdal.  Three months

later, he was discharged with diagnoses of ADHD, Combined Type, Oppositional Defiant

Disorder, Depressive Disorder NOS, and Learning Disorder Nos.  He did very well within the

structure of the school.

Kling continued to play with fire.  In 2004, he burned his face while trying to blow fire

out of his mouth.  This resulted in DHS involvement, which referred Kling for another

psychological evaluation.  At that time, Kling was no longer in therapy and he was barely

attending school.  He scored a 77 on the Verbal IQ, a 65 on Perceptual Reasoning, 74 on

Working Memory, 50 on Processing Speed, and had a Full Scale IQ of 60.  Allan Cordova,

Ph.D., thought the test results were likely an "underestimate of his true abilities"  because his

motivation was low.  The doctor thought that based on previous test results "his true abilities

probably fall within the Borderline range."  Tr. 522.  The doctor noted that even with the

interventions, Kling's behavior problems had continued and intensified.  He suggested residential

treatment or, alternatively, intensive family therapy.  He urged a higher level of parental

supervision.

At an appointment with his physician for his well adolescent visit, he reported that he had

dropped out of high school to be with a girl.  He had 1.3 credits remaining to obtain his GED.

He was engaged to be married to a different woman who was a recent high school graduate with

a three year old child.  He had not taken his medications for four months because he did not like

how they made him feel.  His physician described him as "very difficult to engage during the

visit."  Tr. 697.

PAGE 7 - OPINION AND ORDER

Kling was referred for another intellectual evaluation at the agency's request. Patrick Ethel-King, Ph.D., interviewed Kling in February 2012 and learned that Kling had not graduated from high school, but he had married a woman with a child. He, his wife, and the child were living with Kling's mother. Kling reported he had attempted suicide the previous year by trying to slice his wrist. Otherwise, Kling had no current suicidal ideation and his current health was "overall, well." Tr. 709. He reported he was prescribed Concerta and he thought the medication was "semi helpful." *Id.* Kling said he had begun smoking marijuana at the age of 15 and that he last smoked about a week ago for pain relief. He said his driver's license had been suspended due to a marijuana conviction. On testing, Kling's Verbal IQ was 70, Perceptual Reasoning was 67, Working Memory was 60, Processing Speed was 62, and his Full Scale IQ was 59. Thus, Kling's cognitive functioning fell in the moderately impaired classification range, but the doctor noted his "functional abilities suggest that his intellectual functioning falls somewhere in the borderline range." Tr. 712. Dr. Ethel-King thought Kling "appeared to be invested in giving his best effort on all tasks." Tr. 710.

## DISCUSSION

The only issue Kling takes with the ALJ's analysis is her assessment of Kling's intellectual functioning under Listing 12.05. The listings are "descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect." *Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990). If a claimant's impairment meets a listed impairment, he is presumed unable to work and is awarded benefits without a determination whether he can actually perform prior work or other work. *Id.* at 532. The claimant bears the burden of proving he has an impairment that meets or equals the criteria of an

impairment listed in Appendix 1 of the Commissioner's regulations.  *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005).

The structure of Listing 12.05 is different from the others in that the claimant's impairment must "satisf[y] the diagnostic description in the introductory paragraph AND any one of the four sets of criteria[.]"  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00A.  The introductory paragraph indicates the listing applies to "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  *Id.* at § 12.05.  Severity is met when the requirements in A, B, C, or D are satisfied.  Only Listing 12.05C is at issue here.  Thus, Kling must point to "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]"  *Id.*  When "more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05."  *Id.* at § 12.00(D)(6)(c).

I.    Introductory Paragraph

Unlike the other listings, Kling must satisfy the introductory paragraph of Listing 12.05, which requires "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  *Id.* at § 12.05.  Here, as I indicate below, the IQ scores support a finding of significant subaverage general intellectual functioning during the developmental period; he obtained Full Scale IQs of 60 in 2004 and 59 in 2012.

PAGE 9 - OPINION AND ORDER

As for deficiencies in adaptive functioning prior to age 22, a variety of factors are relevant including poor academic performance, participation in special education, and work history. *See Lewis v. Astrue*, No. CV 10-63-SU, 2011 WL 1085254 (D. Or. Feb. 15, 2011); *Christner v. Astrue*, 498 F.3d 790, 793 (8th Cir. 2007). Other examples include difficulties reading and writing and dropping out of school. *Fielder v. Comm'r of Soc. Sec. Admin.*, No. 3:14-cv-00523-MA, 2015 WL 1648987, at *4 (D. Or. Apr. 13, 2015).

While Kling's failure to finish high school is not indicative of adaptive functioning problems,[1] other factors do support a finding of deficits in adaptive functioning before age 22. Specifically, Kling attended special education courses, his teachers repeatedly complained about behavior in class, he spent three months at the age of nine in residential treatment, and he has virtually no work history. The ALJ recognized Kling would need to learn his job via demonstration rather than in writing, that he would need a work environment requiring only simple decision making, that he would not tolerate workplace changes well, that he should not perform work requiring contact with the general public, and that he should not perform tasks requiring teamwork. The fact that the ALJ accepted these limitations suggests she too identified areas where Kling displays difficulties in adaptive functioning. Plaintiff received SSI until the age of 18, which further supports a conclusion of deficits in adaptive functioning prior to the age of 22. Tr. 417 (Kling functionally equals the listings; marked limitations in several areas).

Kling demonstrated that he met this criteria.

---

[1]The evidence suggests he dropped out to be with a girlfriend. Tr. 696.

II.   <u>Valid IQ Scores</u>

In 2004 and again in 2012, Kling's relevant IQ scores ranged from a low of 59 (2012 Full Scale IQ) to a high of 77 (2004 Verbal IQ).  The question is whether the ALJ gave sufficient reasons to question the validity of the lowest of these scores.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(D)(6)(c).  In an unpublished decision, the Ninth Circuit agreed that "an ALJ can decide that an IQ score is invalid."  *Thresher v. Astrue*, 283 F. App'x 473, 475 (9th Cir. 2008). The court explained that it had "never decided what information is appropriately looked to in deciding validity[,]" commenting that some courts consider "other evidence" while others require "an empirical link between the evidence and the score."  *Id.* at 475 n.6 (citations omitted).

The ALJ rejected the 2004 and 2012 IQ scores finding they were affected by Kling's marijuana use, which he had used regularly since August 2004.  She referred to the 2001 and 2002 scores, suggesting that his Full Scale IQs of 80 and 84 in those early years indicated his use of marijuana negatively affected his later IQ scores.

Importantly, however, there is no statement by any physician, including Dr. Ethel-King, that marijuana was a reason Kling's scores were lower in 2004 and 2012.  As a result, the ALJ's reasoning was based on pure speculation and is not sufficient to support her conclusion about the validity of the IQ scores.  *See Lewis*, No. CV-10-63-SU, 2011 WL 1085254, at *4 (no evidence of drug use; doctor suggested only that drug use "could have" affected IQ score); *Williams v. Colvin*, No. 5:12-cv-67-D, 2013 WL 6058204, at * 10 (E.D. N.C. Nov. 15, 2013) (no doctor expressed opinion that substance abuse contributed to cognitive impairment); *Williams v. Astrue*, 692 F. Supp. 2d 1331, 1338-39 (N.D. Fla. 2010) (ALJ speculated as to effect of drug and alcohol use on IQ scores, rather than relying on medical professional); *Luna v. Astrue*, No. C08-

PAGE 11 - OPINION AND ORDER

5581RJB-KLS, 2009 WL 1763305, at *4, 7 (W.D. Wash. Jun. 18, 2009) (remanding because effect of substance abuse on IQ not entirely clear); *Holmes v. Apfel*, No. 98 C 5087, 1999 WL 731769, at *4-5 (N.D. Ill. 1999) (ALJ's rejection of IQ scores on basis of drug and alcohol abuse was based on "pure speculation"). Dr. Ethel-King was aware of Kling's marijuana use and did not opine that Kling's test results were connected in any way to his marijuana use.[2]

The ALJ also concluded Dr. Ethel-King and Dr. Cordova thought Kling's scores were inconsistent with his adaptive functioning. Specifically, the ALJ opined:

> Dr. Ethel-King noted that although the testing results reflected the claimant was within the intellectually disabled range of intelligence, his functional abilities suggested his intellectual functioning fell within the borderline range. Also, Dr. Cordova noted that although the claimant's I.Q. scores fell in the intellectually disabled range of intelligence, his true abilities probably fell within the borderline range.

Tr. 21.

Kling does not challenge the ALJ's reason for rejecting Dr. Cordova's 2004 test results, since Dr. Cordova specifically commented that Kling's motivation was low and the test results were "likely an underestimate of his true abilities." Tr. 522. These are appropriate reasons to question the validity of the 2004 test results.

Kling does argue the ALJ improperly relied on Dr. Ethel-King's observation about his functional abilities to find the 2012 IQ scores invalid, when the doctor simply asserted Kling's diagnosis was more accurately borderline intellectual functioning. In this context, I agree the doctor's statement was ambiguous. Dr. Ethel-King specifically noted that Kling "engaged in all

---

[2]Kling also points out the regulations direct that IQ scores "tend to stabilize by the age of 16" and that IQ test results of 40 or above obtained between ages 7 and 16 should be considered current for only two years. 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00D(10).

activities with little prompting and appeared to be invested in giving his best effort on all tasks.

Therefore, his performance was thought to be a reasonably valid representation of his current

level of functioning."  Tr. 710.  This appears to conflict with the doctor's later observation that

while the intellectual testing indicated Kling fell in the mentally retarded range, "his functional

abilities suggest that his intellectual functioning falls somewhere in the borderline range."  Tr.

712.  Without further explanation from the doctor as to his opinion on the validity of the IQ

scores, his statement is insufficient to justify the ALJ's finding that the testing was invalid.

Indeed, while the grounds on which to question the validity of test results can include

consistency with educational, occupational, and other functional limitations, along with lack of

effort or malingering, there is no dispute Kling received special education services, had difficulty

reading, spelling, and performing math, had a history of behavioral problems while in school, and

has little to no work history.  *Cf. Brooks v. Barnhart*, 167 F. App'x 598, 599-600 (9th Cir. 2006)

(IQ of 59 was inconsistent with graduation from technical school and seventeen year work

history); *Hickel v. Comm'r of Soc. Sec.*, 539 F. App'x 980, 984-85 (9th Cir. 2013) (high school

graduate and worked part-time).

The Commissioner points out that Kling does not carry a diagnosis of mental retardation

or intellectual disability.[3]  Rather, he has been diagnosed with borderline intellectual functioning.

She contends that, therefore, the ALJ properly determined Kling's IQ scores are invalid

indicators of his intellectual impairment.  To the contrary, the absence of such a diagnosis does

not preclude meeting Listing 12.05C nor does it invalidate the IQ score.  *See Brooks v. Astrue*,

_____

[3]78 Fed. Reg. 46,499 (Aug. 1, 2013) (replacing "mental retardation" with "intellectual disability").

PAGE 13 - OPINION AND ORDER

No. 3:11cv-01252-SI, 2012 WL 4739533, at *5 (D. Or. Oct. 3, 2012) ("by the plain language of the regulations, [plaintiff] may meet the listing without a formal diagnosis of mental retardation"); *see also Stokes v. Astrue*, No. CV 09-1264-PK, 2011 WL 285224, at *9 (D. Or. Jan. 4, 2011) (citing numerous other cases for the same proposition).

Finally, the Commissioner argues Kling's failure to take his medications, which helped him when he took them as prescribed, undermined the validity of his IQ scores. This is not a basis given by the ALJ to question the validity of the IQ scores and I do not consider it. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006) (internal quotation omitted) (court cannot "affirm the decision of an agency on a ground that the agency did not invoke in making its decision").

The ALJ erred in concluding Kling's 2012 test results, revealing a Verbal IQ of 70 and a Full Scale IQ of 59, were invalid.

III.    Physical or Mental Impairment

The Commissioner does not dispute that Kling suffers from a physical or other mental impairment which imposes an additional and significant work-related limitation of function, in satisfaction of the second prong of Listing 12.05(C). The standard requires that the physical or mental impairment constitute a severe impairment. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00A ("we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c)). Here, the ALJ concluded Kling has the additional severe impairments of status post left ankle fracture, a conduct disorder, ADHD, and cannabis abuse versus dependence.

PAGE 14 - OPINION AND ORDER

IV.   <u>Remedy</u>

The court has the discretion to remand the case for additional evidence and findings or to award benefits. *McCartey v. Massanari*, 298 F.3d 1072, 1076-77 (9th Cir. 2002). The court has discretion to credit evidence and immediately award benefits if the ALJ failed to provide legally sufficient reasons for rejecting the evidence, there are no issues to be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence is credited. *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014). Alternatively, the court can remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.* at 1021.

Although I find the ALJ failed to provide legally sufficient reasons for rejecting the 2012 IQ scores, I find there are outstanding issues that must be resolved before a determination of disability can be made. Importantly, the ALJ would not be required to find Kling disabled if the IQ score were credited because it appears from the record that Kling was not candid with Dr. Ethel-King about the fact that he was not taking medications he conceded were helpful to him. Plaintiff testified that he stopped taking the medications in 2011, consistent with his medical records, but plaintiff did not reveal this fact during the 2012 evaluation with Dr. Ethel-King. Thus, the appropriate resolution of this case is a remand for further development of the record, which may require additional testing.

PAGE 15 - OPINION AND ORDER

## CONCLUSION

The decision of the Commissioner is reversed.  This action is remanded to the

Commissioner under sentence four of 42 U.S.C. § 405(g) for rehearing to further develop the

record as explained above.  Judgment will be entered.

IT IS SO ORDERED.

DATED this ____13th____ day of September, 2016.


                                        /s/ Garr M. King_____
                                        Garr M. King
                                        United States District Judge